## In re BIG CAHABA COAL CO.

(District Court, N. D. Alabama, S. D. December 30, 1910.)

No. 9,849, In Bankruptcy.

1. REFERENCE (§ 99*)—FINDINGS—REVIEW BY TRIAL COURT.

The rule that weight should be given to a referee's findings by the trial court applies more particularly to cases where the findings are deduced from conflicting evidence, and depend on the credibility of witnesses, than to cases in which different inferences are to be drawn from the established facts.

[Ed. Note.—For other cases, see Reference, Cent. Dig. § 153; Dec. Dig. § 99.*]

2. BANKRUPTCY (§ 340*)—CLAIMS—FINDINGS—REVIEW.

Evidence held to require a finding that payments made by a claimant of a bankrupt corporation to the extent of $2,700, for advances made for its benefit in the nature of a loan was not a contribution to the corporation's capital.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. § 340.*]

3. MONEY LENT (§ 1*)—TIME—REPAYMENT.

Where a claimant advanced money to a corporation to enable it to continue its business on agreement that it was not to be repaid until the company was on a working basis, such agreement only affected the time of maturity, and did not authorize the expunging of a claim for the amount advanced against the corporation's estate in bankruptcy.

[Ed. Note.—For other cases, see Money Lent, Cent. Dig. §§ 1–4; Dec. Dig. § 1.*]

In the matter of bankruptcy proceedings of the Big Cahaba Coal Company. Petition to review referee's order expunging the claim of J. C. Reinhardt. Petition granted, and order reversed.

Campbell & Johnston, for petitioner J. C. Reinhardt.

Ullman & Winkler, for trustee.

GRUBB, District Judge. This is a petition to review the order of the referee, expunging from the record the claim of J. C. Reinhardt against the bankrupt, amounting to $2,700, for moneys advanced by him to the bankrupt. The decision depends upon whether the moneys, which were admittedly paid to or for the bankrupt by the claimant, are to be considered as contributions by him to the capital of the bankrupt, or as loans or advances made to it by him. The original written agreement was between the claimant and one Chairsell, who was president of the bankrupt corporation and owned more than one-half of its capital stock, and probably was considered by the parties as its

---

owner and controller. The bankrupt was a coal mining corporation in need of additional capital to put it on an operating basis. In this exigency, and for this object, the agreement between Chairsell and claimant was made. At the time it was made there were 60 shares of treasury stock owned by and subject to disposition of the company. The effect of the written agreement was that claimant was to supply the company with $5,000 capital, and, upon his doing so, claimant and Chairsell were to divide the treasury stock between them. The written agreement evidently does not state the complete understanding of the parties, and should be aided by the oral evidence of the parties because of its patent incompleteness and ambiguity. The intention of the parties evidently was, if claimant furnished $5,000 to the company, he was to be guaranteed by Chairsell an equal ownership with him in the stock of the company, which guaranty was to be secured by Chairsell's deposit of his own stock either with Reinhardt or with the company. The first stock was, in fact, delivered to Reinhardt as he made the advances, and not upon his final contribution as was provided in the written agreement. It is clear that the claimant has no claim as a creditor against the bankrupt for any advances made by him under this written agreement or under the verbal modification of it. On January 14, 1909, the day the agreement was executed, Reinhardt advanced the company $2,000 and received a certificate of stock for 20 shares on account of it. On February 23d he advanced a further sum of about $1,000, and received a certificate for 10 shares. Thereafter and up to July, 1909, he made further various advances aggregating $2,700 for which he received no stock certificates. The question is whether this $2,700 was paid in to the company as capital under the original agreement or as an advance to be repaid under a subsequent and implied agreement. The referee found that it was paid under the original agreement, and expunged the claim.

The evidence of Reinhardt is to the effect that immediately after the advance made by him on February 23d he took the written agreement to his attorney for an opinion, and was advised by him that it was not binding on the company; that he thereupon informed Chairsell, the president of the company and the other party to it, that he was unwilling to proceed with it unless it was confirmed by the company; that thereafter no further stock was issued to him, though he continued to make advances by reason of the needs of the company and his having already invested $3,200 in it, and that he looked to the company to repay his advances when the company got on a working basis; that there was no action by the directors or stockholders looking either to the confirmation of the agreement or to the repayment of the advances. Chairsell denies generally that there was ever any loan made by Reinhardt or any agreement by the company to repay Reinhardt the sums paid by him to it, and asserts that all payments were made under the original agreement. He does not deny that he was informed by Reinhardt of the invalidity of the agreement between them as to the company or of the unwillingness of Reinhardt to proceed under it unless it was confirmed by the company. His denials and assertions are in the nature of general conclusions rather than

specific facts, and of less value for that reason. The fact that no stock was issued to Reinhardt on the occasions of the various advances made by him after February 23d, as had been done upon the occasion of each advance prior to that time and as was provided by the agreement should be done, indicates a change of agreement and corroborates Reinhardt's statement that from that time forward the advances were not made under the original agreement. A fair inference from the facts seems to be when Reinhardt learned that the agreement was of no validity against the company, without confirmation, and so informed Chairsell, the agreement was held in abeyance pending such confirmation, and, as the exigencies of the company and of the parties demanded that immediate advances be made to it, such advances were thereafter made by Reinhardt without any definite agreement, but with the knowledge and consent of Chairsell, the president of the company, and with the expectation of repayment both on Chairsell and Reinhardt's part when the company was put on a working basis, in the event the stock agreement between Reinhardt and Chairsell was never confirmed. The action of the stockholders on September 16, 1909, directing the return to Chairsell of his 125 shares, shows that the agreement between Reinhardt and Chairsell was never confirmed by the company. Under this state of facts, payments made by Reinhardt for or to the company with the knowledge and consent of its president would be made under an implied agreement on the part of the company to repay, and create a legal liability against it. The fact that repayment was not to be made until the company was on a working basis would affect the time of maturity only and would not defeat the liability of the company, particularly as its failure to get on a working basis was due to its bankruptcy. That the payments subsequent to February 23d were not made under the terms of the original agreement is corroborated, also, by the fact that the payments substantially exceeded in the aggregate the $5,000 which the agreement provided was to be the consideration for the interest acquired by Reinhardt under it. If Chairsell's testimony as to efforts made by the company to sell the treasury stock relates to a period after the agreement was made, as it rather seems to do, this would be also persuasive that the agreement was no longer being acted upon by the parties, since such efforts were inconsistent with its continuance.

The weight given to the referee's findings applies more particularly to cases in which such findings are deduced from conflicting evidence and depend upon the credibility of the witnesses, and not to cases in which different inferences are to be drawn from facts established. This case belongs rather to the latter class.

The petition for review is granted, and the order of the referee expunging the claim is set aside, and the costs of the petition for review are taxed against the trustee.